**ALANA L. MCMAINS**
California State Bar No. 285942
**MCMAINS LAW, APC**
185 West F St. #100-R
San Diego, California 92101
Telephone: (619) 310-5421
alana@mcmainslaw.com

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| R.V., an individual, | Case No.: 4:26-cv-2473 |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | 1. **Eighth Amendment Violation;** |
| | 2. **Gender Violence;** |
| UNITED STATES OF AMERICA; | 3. **Sexual Battery;** |
| RAY J. GARCIA; DARRELL | 4. **Intentional Infliction of Emotional Distress;** |
| WAYNE SMITH; THE ESTATE OF | |
| NICHOLAS RAMOS; individuals; | 5. **Battery;** |
| and DOES 1 through 10, inclusive; | 6. **Negligence;** |
| | 7. **Bane Act;** |
| Defendants. | 8. **Trafficking Victims Protection Act; and** |
| | 9. **California Trafficking Victims Protection Act** |
| | **DEMAND FOR JURY TRIAL** |

### INTRODUCTION

1. This action stems out of Plaintiff R.V.'s repeated sexual harassment and abuse at the hands of those entrusted with her care when she was in custody at the Federal Correctional Institution Dublin ("FCI Dublin"), an all-female prison owned and operated by Defendant the UNITED STATES OF AMERICA ("the UNITED STATES") via its agency the Federal Bureau of Prisons ("BOP").

1

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

2.      When she began her sentence, Plaintiff had no idea she was entering an environment so rampant with sexual abuse and corruption that guards and prisoners alike had nicknamed it "the rape club."

3.      In approximately 2020, the Department of Justice ("DOJ") began an investigation into the constitutional and human rights abuses at FCI Dublin. The investigation is ongoing.

4.      Since the inception of the investigation, nine correctional officers ("COs") working for the BOP at FCI Dublin have been convicted of crimes related to the sexual abuse of the female prisoners at the facility.

5.      Even the Warden at FCI Dublin was an active participant in the widespread sexual misconduct and its cover-up. Defendant RAY J. GARCIA ("GARCIA") was the associate warden at FCI Dublin between December 2018 and November 2020 and the warden of FCI Dublin from November 2020 to July 2021. Thus, GARCIA was in charge of FCI Dublin during the period that Plaintiff was being abused by COs NICHOLAS RAMOS ("RAMOS"), DARRELL WAYNE SMITH ("SMITH"), and an unknown DOE CO ("DOE 1").

6.      As the warden, GARCIA was responsible for safekeeping, care, protection, discipline, programming, and release of inmates incarcerated at FCI Dublin. GARCIA was also responsible for hiring, training, and supervising/managing staff, and determining operating procedures and policies. With GARCIA in charge of FCI Dublin, COs had free rein to get away with horrifying acts of abuse.

7.      GARCIA eventually convicted in federal court of multiple counts of sexual abuse of a ward. He was sentenced to 70 months in prison.

8.      RAMOS and SMITH were agents and employees of the BOP. Both men took advantage of their positions as COs at FCI Dublin to prey on the vulnerable, incarcerated women ostensibly under their care.

9.      Between approximately June and July of 2021, RAMOS, SMITH, and

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

a unknown DOE 1 each sexually assaulted Plaintiff in violation of federal and state law. Upon information and belief, Plaintiff was just one of many victims abused by both RAMOS, SMITH, and DOE 1.

10.   As a result of Defendants' actions, Plaintiff suffered numerous and substantial emotional, physical, and personal injuries that continue to affect her today, and likely will for the rest of her life.

## JURISDICTION AND VENUE

11.   Plaintiff's claims arise under the United States Constitution, the Federal Tort Claims Act, 28 U.S.C. § 1346 ("FTCA"), and California statutory and common law.  The Court has federal question jurisdiction over Plaintiff's federal claims, both constitutional and statutory, pursuant to 28 U.S.C. § 1331.  Further, the Court has supplemental jurisdiction over Plaintiff's claims under California law pursuant to 28 U.S.C. § 1367 because these state-law claims arise from a common nucleus of operative fact with Plaintiff's federal claims.

12.   This Court has personal jurisdiction over Defendants.  Upon information and belief, all individual Defendants are citizens of and domiciled in California.  The Court has specific jurisdiction over Defendants because they committed the actions and commissions forming the basis for each claim against them in California.

13.   Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1402(b).  As noted above, Defendants' actions and omissions that give rise to Plaintiff's claims occurred at FCI Dublin, located at 5701 8th St. in Dublin, California, which is within the Northern District of California.

## PARTIES

14.   Plaintiff is an individual who is a citizen of and domiciled in California.  She was in custody at FCI Dublin at all times relevant to this action. As a victim of sexual assault as defined by section 115.6 of the Prison Rape

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

Elimination Act ("PREA"), she is using her initials to protect her privacy.

15.     Defendant United States of America ("the UNITED STATES") is a sovereign entity that has waived its immunity for certain claims, including the claims set forth herein, and is liable for the acts of its employees and servants.

16.     The UNITED STATES owns, operates, managers, and oversees numerous prisons via its agency the BOP, including FCI Dublin.

17.     Defendant GARCIA is an individual who is a citizen of and domiciled in California, and he has been at all times relevant to this Complaint. He is currently temporarily residing in the State of Iowa in the custody of the BOP while serving his sentence.

18.     Defendant SMITH is an individual who is a citizen of and domiciled in Florida. At the time of the tortious acts and omissions alleged in this Complaint, SMITH was a citizen of and domiciled in California, where he worked for the BOP as a CO at FCI Dublin.

19.     Due to the death of RAMOS, Plaintiff is bringing her claims against his estate.[1] RAMOS was an individual and citizen of California, as well as an employee of the BOP, at all times relevant to this Complaint

20.     Defendant UNITED STATES, acting through its secretary, supervisory employees, employees, agents, and staffs, including those at the BOP, hired individual Defendants GARCIA, SMITH, and RAMOS as employees.

21.     While performing the acts and omissions that Plaintiff alleges in this Complaint, GARCIA, SMITH, and RAMOS were acting within the scope of their official employment and authority, whether actual or apparent, with the BOP's permission and consent.

22.     Plaintiff is ignorant as to the true names, identities, and capacities of Defendants DOES 1 through 10, inclusive.   Therefore, Plaintiff sues these

---

[1] For ease of understanding, Plaintiff will simply refer to this Defendant as "RAMOS" unless necessary for clarification.

Defendants via fictitious names.  When the true names, identities, or capacities of such fictitiously designated Defendants are ascertained, Plaintiff will seek leave of this Court to amend the Complaint to assert their true names, identities, and capacities, as well as any specific relevant allegations.

23.    Upon information and belief, Defendant DOES 1 through 10, inclusive, were COs or otherwise employed by the BOP.  At all times relevant, these Defendants were acting within the scope of their official employment and authority, whether actual or apparent.

24.    Each DOE Defendant is responsible, in some manner, for the events and occurrences delineated in this Complaint, thereby legally causing the injuries and damages to Plaintiff as will be alleged.

25.    All Defendants were at all times responsive for the custody, care, control, direction, safety, and wellbeing of Plaintiff.

### THE PRISON RAPE ELIMINATION ACT

26.    Recognizing the severe problem of rape and sexual assault within correctional institutions, Congress passed the PREA in 2003.  *See* 34 U.S.C. § 30301, *et seq*.  The statute created the National Prison Rape Elimination Commission, which was tasked with establishing national standards for preventing and responding to sexual abuse of inmates.  These standards became effective in August of 2012 and were published in the Federal Register.

27.    PREA regulations are mandatory for all employees of the BOP.  The PREA required the BOP to create and maintain a strict "written policy mandating zero tolerance toward all forms of sexual abuse and sexual harassment outlining [the BOP's] approach to preventing, detecting, and responding to such conduct. Periodic audits of all federal correctional facilities is required in order to ensure compliance with the standards put forth in the regulations.

28.    The PREA requires that all staff "report immediately" and "knowledge, suspicion, or information regarding an incident of sexual abuse or

sexual harassment that occurred in the facility," as well as any "retaliation against inmates or staff who reported such an incident," as well as any "staff neglect or violation of responsibilities that may have contributed to an incident or regulation." 28 C.F.R. § 115.61.

29.    It further mandates that prison officials assess whether a prison inmate is subject to a substantial risk of imminent sexual abuse, and if it is determined that the substantial risk exists, the prison must take immediate action to protect the inmate. *Id.* § 115.62.

30.    Pursuant to the PREA, all employees of the BOP that have contact with inmates must be trained on the following items: (1) zero-tolerance policy for sexual abuse and sexual harassment; (2) responsibilities regarding detection, reporting, and responding to sexual abuse; (3) inmates' right to be free from sexual abuse and sexual harassment; (4) inmates' and employees' rights to be free from retaliation for reporting sexual abuse or harassment; (5) the dynamics of sexual abuse and sexual harassment in confinement; (6) the common reactions of sexual abuse/assault victims; (7) how to detect and respond to signs of threatened and actual sexual abuse; and (8) how to avoid inappropriate relationships or situations with inmates.

31.    The statute states that presumptive disciplinary sanction for staff that sexually abuses inmates is termination of employment. *Id.* § 115.76.

32.    The PREA also requires the BOP to offer medical and mental health care to all sexual abuse victims. *Id.* § 115.83.

## THE CULTURE OF SEXUAL ABUSE AND RETALIATION AT FCI DUBLIN

33.    Despite the long-established requirements of the PREA, personnel at FCI Dublin engaged for years in a pattern and practice of engaging in sexual abuse of inmates and then covering it up.

34.    FCI Dublin had an institutional culture of defiance of the PREA.  COs

6

regularly turned a blind eye towards rampant sexual assault and abuse of female inmates. The culture prioritized loyalty to fellow COs over the duty under the PREA to prevent sexual assault and assist victims. Inmates who spoke out were regularly retaliated against, also in violation of the PREA.

35. This culture was particularly entrenched during the period between December 2018 and November 2020, when GARCIA was the associate warden at FCI Dublin.

36. As the warden, GARCIA was responsible for the safekeeping, care, protection, discipline, programming, health, employment, and release of inmates incarcerated at FCI Dublin. GARCIA was also responsible for hiring, training, supervising, and managing staff. He had disciplinary authority over all employees working at FCI Dublin as well as all inmates incarcerated there. GARCIA was further in charge of determining, enacting, and employing operating procedures and policies for FCI Dublin.

37. GARCIA was required to manage FCI Dublin's employees and inmates in accordance with BOP policies and procedures, as well as in full compliance with federal and state laws. GARCIA had a duty to not violate the constitutional rights of the women incarcerated at FCI Dublin.

38. One of GARCIA's responsibilities was to help ensure that FCI Dublin was in compliance with the PREA. He led training for staff regarding the prevention and detection of rape within the facility, including training on the proper procedures for handling complaints or suspicions of sexual misconduct at the prison. All employees of FCI Dublin, including GARCIA, were specifically notified that any emotional, physical, sexual, or financial involvement with inmates or former inmates was contrary to BOP policies and/or violated federal law. GARCIA was also tasked with conducting the annual audits of the prison required under the PREA, thus making him responsible for investigating, documenting, and reporting any sexual assaults or abuse that occurred at FCI Dublin.

39. GARCIA failed to comply with the PREA throughout his tenure at FCI Dublin. He failed provide sufficient or effective training to the COs, staff, and independent contractors working with female inmates. He further failed to conduct adequate and accurate audits of the facility, because he was very aware that he himself, along with many others working at FCI Dublin, was personally engaging in sexual abuse of the incarcerated women. GARCIA also, as part of his purposeful coverup of the epidemic of sexual abuse at the prison, failed to properly respond to or investigate complaints and/or allegations of sexual assault that he received as warden.

40. GARCIA sexually assaulted multiple women under his care. He groped women, forced them to pose nude, and verbally degraded them. GARCIA even continued to sexually harass women once they had been sent to BOP-controlled halfway houses, sending pictures of his penis to one. He intentionally used his power as warden to take advantage of his victims, promising them preferential treatment if they complied with his demands.

41. In September of 2021, GARCIA was indicted for multiple counts of federal felony sexual abuse of a ward, based on sexually assaulting inmates and having naked photographs of inmates on his government-issued cell phone. He was convicted by a jury trial in March of 2023. When sentencing him to 70 months, the U.S. District Judge Yvonne Gonzalez Rogers declared that FCI Dublin was a "cesspool" and that GARCIA not only "did nothing about it," but actually "went along with the ride and enjoyed the cesspool [him]self."

42. GARCIA's sexual misconduct was known to others at FCI Dublin, and it set an example that COs and other staff could get away with abusing the inmates. GARCIA modeled poor behavior, and he intentionally ignored other employees' acts of sexual abuse that he either knew of or should have known about. Individuals working at FCI Dublin knew, through observing GARCIA's conduct, that sexual abuse of women was acceptable and would not be punished. Thus, GARCIA

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

ratified the illegal conduct of his inferior officers.

43.    GARCIA, SMITH, RAMOS, and the other abusers at FCI Dublin all were aware that the security camera system at FCI Dublin was inadequate. There were multiple areas that would not be captured by the surveillance camera, so they intentionally brought women to those locations to sexually abuse them.

44.    Besides GARCIA, SMITH, and RAMOS, at least eight other FCI Dublin employees engaged in the sexual abuse of female inmates, according to the DOJ.[2]  While the investigation remains ongoing, the following individuals have been charged:

(a)    CO Ross Klinger pleaded guilty to sexual abuse of a ward in February of 2022.

(b)    Chaplain James Highhouse pleaded guilty in February of 2022 and was sentenced to 84 months custody.

(c)    Enrique Chavez pleaded guilty in October of 2022 and was sentenced to 20 months prison.

(d)    CO John Bellhouse was convicted in June of 2023 by a jury and sentenced to 63 months prison;

(e)    CO Andrew Jones pleaded guilty in August of 2023 and was sentenced to 96 months prison;

(f)    CO Nakie Nunley pleaded guilty in July of 2023 and was sentenced to 72 months prison;

(g)    CO Jeffrey Wilson pleaded guilty in August of 2025 and faces sentencing in February of 2026; and

(h)    CO Lawrence Gacad pleaded guilty in August of 2025 and was sentenced to 5 years probation.

---

[2] *See* U.S. DOJ, *Two More Dublin Federal Correctional Officers to Plead Guilty to Sexually Abusing Multiple Female Inmates* (Jul. 14, 2023), https://www.justice.gov/usao-ndca/pr/two-more-Dublin-federal-correctional-officers-plead-guilty-sexually-abusing-multiple.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

45. Upon information and belief, many more COs, staff, and contractors engaged in sexual abuse of women, even though they have not been indicted. Many of those additional COs are either on administrative leave pending investigation or were transferred to another BOP facility. As of May 2022, there were 17 current or former FCI Dublin employees being investigated for sexual misconduct by either the Office of the Inspector General or the BOP.

46. As the scandal gained more media attention, U.S. Senate conducted a bipartisan investigation into sexual abuse of female prisoners in BOP custody. In December of 2022, the U.S. Senate Permanent Committee on Investigations, Committee on Homeland Security and Government Affairs released their final report.

47. The report stated that BOP employees have sexually abused female prisoners in at least two-thirds of facilities that have held women over the last decade. It additionally noted that BOP management failures and seriously flawed investigative practices are both to blame for this terrible failure to successfully implement the PREA.

48. The report noted that FCI Dublin had failed to detect the culture of BOP employees sexually abusing female detainees before, during, and after abuse occurred. It noted that the BOP does not systematically analyze complaint date to detect potentially problematic employees or institutions. The BOP also failed to hold employees accountable for their misconduct, with a backlog of approximately 8,000 internal affairs cases alleging employee misconduct, some of which have been pending for more than five years.

49. The report also pointed out the inadequacy of the PREA audits in detecting or preventing sexual assaults of inmates. It noted that FCI Dublin's PREA audits all came back clean, despite the known sexual misconduct that the guards were engaging in during that time period. It asserted that FCI Dublin had a recurring problem of sexual abuse of female prisoners, and that there was evidence

that problem had been ongoing since the 1990s. It concluded that the BOP had failed to take agency-wide action to address the problem.

50. In August of 2023, a class action lawsuit was filed against the BOP and FCI Dublin officials. See California Coalition for Women's Prisoners et al. v. United States et al., No. 4:23-cv-4155-YGR (N.D. Cal.). The Honorable Yvonne Gonzalez-Rogers, the presiding judge in that case, appointed a Special Master to oversee Dublin after determining that it was "a dysfunctional mess" wherein the BOP had "proceeded sluggishly with intentional disregard of the inmates' constitutional rights despite being fully apprised of the situation for years." See *id.* (ECF No. 222, at 1).

51. The BOP appointed a new Deputy Captain at FCI Dublin after the DOJ investigation and first civil lawsuits were filed, and she testified before Judge Gonzalez-Rogers. The Deputy Captain testified that the COs at FCI Dublin lacked training and knowledge of BOP policies. She further stated that FCI Dublin was not responsive to inmate requests and emails, including allegations of sexual assault.

52. As a result of the criminal prosecutions against BOP employees, the Senate investigation, and the civil suits against the United States, there was substantial attention on FCI Dublin. The women incarcerated at the facility began to experience substantial retaliation, especially those who had filed PREA complaints and/or tort claims against the United States. Officers would question women as to whether they were "part of that lawsuit," trying to single out the victims who had made accusations.

53. The COs at FCI Dublin retaliated against the incarcerated victims who made reports by putting them in solitary confinement in the Special Housing Unit (SHU), conducting daily searches of their cells, and placing them on lockdown. Sometimes even the victims' cellmates would be placed in the SHU, in an effort from deterring witnesses from coming forward. Victims also lost privileges such as visitation, phone calls, good time credits, and coveted job placements. Some were

transferred to other institutions, in violation of the no-transfer order issued by the district court in the class action suit. One woman was denied her epilepsy medication after she reported that she was raped by CO Smith. The COs at FCI Dublin further attempted to discourage victims from contacting their attorneys by taking their legal mail, denying them legal calls, and forcing them to undergo a strip search after any legal visit. Some women even received explicit or implicit threats of violence against them. One CO even showed up at the home of one of his victim's mothers after the victim reported the abuse.

54.     In April of 2024, the BOP shut down FCI Dublin. Then-Director of the BOP Colette S. Peters acknowledged that the facility was "not meeting expected standards" despite the fact that the BOP had taken "unprecedented steps and provided a tremendous amount to address culture, recruitment and retention, aging infrastructure – and most critical – employee misconduct." The closing came after the release of a report that demonstrated critical levels of black mold and asbestos in the facility, which had resulted in respiratory issues and rashes to the incarcerated women.

55.     The BOP further retaliated against the FCI Dublin victims during the process of transferring them to other facilities. During the bus ride from FCI Dublin, COs denied the women the restroom and feminine hygiene products, causing multiple women to soil themselves. At least one CO played painfully loud music with sexually explicit lyrics to make the women uncomfortable. Additionally, many of the women lost their personal property, as the BOP only allowed them to pack one duffle back and the rest of their items were destroyed. And the BOP put arbitrary limits on the number of photographs an inmate could take, for example, leaving them no choice but to abandon treasured photographs of loved ones. When their property was delivered to them at their new facilities, many found that items were missing and/or damaged.

56.     Once the women arrived at their new facilities, they faced

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

discriminatory and retaliatory treatment from the BOP staff there, simply because they had arrived from FCI Dublin. BOP guards were explicit about not wanting transfers from FCI Dublin, and they expressed their frustration in myriad ways, including: feeding the women inferior food; refusing to provide them soap, pillows, and clean laundry; denying them jobs; conducting unnecessary searches of them; and making outright threats against them. These guards were resentful that the "Dublin women" had spoken out about abuse and expressed concern that now there would be complaints at their institutions. One guard said, "We don't need Dublin problems here; let's shoot 'em now." Others called the women "snitches" and "rats."

57.    Even the victims who were no longer in BOP custody faced retaliation for coming forward. Multiple women received threats against them. In one case, a CO who was accused of sexual abuse convinced another CO to call a victim's family member and warn her to stay quiet. Women who were living in residential reentry centers run by the BOP faced discriminatory treatment and increased punishment. Further, most of the victims were on supervised release. Thus, the threat of being sent back to BOP custody for a violation hung over the victims' heads at all times. One plaintiff who was on supervised release was sent back into BOP custody after testing positive for an opioid, despite having received prior permission to take pain medication due to her history of cancer and recent back surgery.

58.    On June 5, 2024, the Special Master issued her first report regarding FCI Dublin, finding that it had "a cascade of failure in critical institutional systems and areas," and focusing in particular on the prison's significant problems with inadequate mental health treatment, discipline and due process, and inadequate PREA protocol.  The Special Master stated that it was "unconscionable that any correctional agency could allow incarcerated individuals under their control and responsibility to be subject to the conditions that existed at FCI-Dublin for such an

extended period of time without correction."

59.    In December of 2024, the United States entered into a landmark settlement in which $116 million was paid to 116 survivors of sexual abuse at Dublin.  That settlement, however, did not include every woman who was abused at FCI Dublin.

60.    Many victims did not come forward before the settlement due to their fear of retaliation. These victims saw what happened to the women who filed lawsuits and did not want to receive similar treatment. They believed that filing tort claims or administrative grievances would not only put them at risk of harm, but that they would also be futile due to the BOP's consistent failure to respond to allegations of PREA violations. After the settlement was publicized, however, many more women felt safe coming forward, finally believing that the justice system might actually vindicate them.

**THE SEXUAL ABUSE OF PLAINTIFF AT THE HANDS OF DOE 1, RAMOS, AND SMITH**

61.    Plaintiff arrived at FCI Dublin in approximately November of 2020.

62.    As soon as she arrived at FCI Dublin, Plaintiff realized the environment was rife with cruelty. The COs were frequently degrading to the women, verbally abusing them.  It was not uncommon for the COs to fly into a fit of rage and destroy the women's property.

63.    Frequently, the COs would make sexual comments to women, inquiring and speculating about their sex lives, or assessing and praising their bodies.  COs would walk in on women while they were in the shower and leer at their naked bodies, just to show that they could.  COs would enter women's cells without any reasonable suspicion and conduct pat-downs and strip searches, under the pretext of a minor infraction.

64.    The COs were frequently degrading to the women, verbally abusing them.  It was not uncommon for the COs to fly into a fit of rage and destroy the

women's property.

65. Further, many of the COs had sexual contact with women at the prison. Plaintiff would see officers who repeatedly pulled the same woman out of her cell and took her to a private room. Inmates would openly discuss sexual and romantic relationships between the women and COs. They would also warn each other about which guards were particularly lecherous and abusive.

66. Because these actions were well known to all the inmates at FCI Dublin, they lived in a daily atmosphere of fear. Though some women reported what happened, their complaints would be ignored. Other women did not even attempt to complain, as the COs had threatened them and warned them that nobody would believe the word of an inmate against a guard.

67. Plaintiff herself eventually was victimized by three COs at FCI Dublin: DOE 1, RAMOS, and SMITH.

68. Plaintiff got a job in the kitchen. The COs who worked in the kitchen were known for regularly sexually harassing the women workers, but many women still wanted to work there because it gave them access to better food.

69. DOE was one of Plaintiff's supervisors, and he repeatedly assaulted her while she was working.

70. The first time, DOE kissed her, and when she started to push him away, he grabbed her breasts.

71. Over time, whenever DOE 1 had the chance, he would smack her buttocks.

72. Plaintiff began to comply with DOE 1's sexual advances,=, afraid for her safety.

73. On two occasions, DOE 1 groped her bare breasts, put his hand on her crotch area under her clothes, and then digitally penetrated her

74. Plaintiff also faced sexual abuse from RAMOS.

75. When Plaintiff first met RAMOS, before she knew his bad reputation

15
COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

among the women at FCI Dublin, she told him that his red hair reminded her of her father. RAMOS responded, "Oh, I can be your Daddy any day. You can call me Papi whenever you want." Plaintiff felt disgusted and embarrassed.

76.    After that, RAMOS began to focus his attention on her. He would go to her unit and find her and make sexual comments to her.

77.    It seemed clear that RAMOS had read her file, because he knew personal things about her background, including prior trauma she'd experienced. He told her he knew where she lived and that he knew about her crime.

78.    Eventually, RAMOS escalated the verbal harassment to physical assault.

79.    On approximately four occasions, RAMOS came by her cell during his rounds and initiated sexual activity. He would grope her bare breasts and buttocks and digitally penetrate her.

80.    Once, RAMOS penetrated her vagina with his penis, but Plaintiff became so worried about pregnancy, she started to freak out, and he stopped quickly without ejaculating.

81.    RAMOS repeatedly threatened Plaintiff to make sure she did not report his abuse. He told her frequently that he would have her sent to the hole, he would trash all her belongings, or he would write her up. She stopped keeping her belongings in her lockers because of the fear that RAMOS would throw her things away.

82.    RAMOS also disciplined her any chance he could; as a result of his actions, she lost phone privileges and had restrictions on her commissary privileges.

83.    Plaintiff had to quarantine for the last two weeks of her incarceration at Dubin, due to Covid-19 concerns. RAMOS was angry with her and wanted to make sure she never spoke out against him.

84.    Every morning at 5am, RAMOS would come to her cell with his coworker and good friend, CO Sergio Sausedo.

85.     RAMOS and Sausedo would wake up Plaintiff, roll up her mattress and bedding, and confiscate it until 5pm. This left Plaintiff, trapped in her cell under quarantine, without any ability to lie down or warm herself. When Plaintiff's cellmate tried to lend her a pillow and a sheet because of the cold, RAMOS threatened that he would confiscate her bed too if she helped Plaintiff.

86.     Also, RAMOS ordered Plaintiff to strip every morning when he came and confiscated her bedding. Whenever she tried to push back against him, he would remind her that he knew where she was from and where she lived. He would say, "I'm your Papi, don't ever forget it."

87.     Plaintiff was also sexually abused by SMITH.

88.     Another inmate had warned Plaintiff about SMITH, saying that he was known to sexually harass and terrorize women.

89.     Soon, Plaintiff got on SMITH's radar. He would walk by her window and say to her, "You're my sexy brown eyes."

90.     Once, SMITH came into her cell when she was alone, and he pulled out his erect penis. He said, "Come here, sexy brown eyes, you have a job to do." SMITH then began to masturbate.

91.     Plaintiff was frightened and disgusted, and without thinking, she ran out of the room. SMITH quickly pulled his pants back up and left the cell.

92.     From then on, SMITH resented her and targeted her for retaliation.

93.     SMITH planted a pill in one of her medicine bottles while conducting a search, and Plaintiff was disciplined as a result. She knew better than to try and tell the truth about SMITH, as he had complete power over her.

94.     Plaintiff left FCI Dublin in July of 2021.

95.     In early 2022, RAMOS was placed on administrative leave by the BOP amid investigations into his alleged sexual misconduct with an inmate in 2016.

96.     In May of 2023, SMITH was indicted by a federal grand jury on twelve counts related to the abuse of three FCI Dublin inmates. All charges were eventually

17
COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

dismissed against SMITH following two mistrials due to hung juries.

97. While out of BOP custody, Plaintiff remained extremely traumatized by what had happened at FCI Dublin. Plaintiff was a victim of childhood sexual abuse. As such, the abuse at Dublin exacerbated her preexisting symptoms of anxiety, depression, and PTSD.

98. Plaintiff's severe mental health problems led to a relapse into substance use disorder, as well as criminal activity.

99. She returned to the custody of the BOP in May of 2024, based on a violation of her supervised release; she remained in custody until July of 2024.

100. Plaintiff then served approximately one year of custody in the California Department of Corrections.

101. Plaintiff currently remains under supervision of the U.S. Probation Office. Her term of supervised release is set to end on July 22, 2027.

**FTCA ADMINISTRATIVE EXHAUSTION AND EQUITABLE TOLLING**

102. This action is brought in part pursuant to the FTCA, which provides that a tort claim against the UNITED STATES will be forever barred "unless it is presented in writing to appropriate Federal agency within two years after such claim accrues or unless action is begun with six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented." 28 U.S.C. § 2401(b).

103. As described herein, Plaintiff was subjected to repeated sexual abuse by correctional officers.

104. During her incarceration, Plaintiff was threatened, intimidated, and retaliated against by correctional officers. These officers had the ability to send her to solitary confinement, to prevent her from purchasing food and toiletries, to take away her privileges to communicate with her family, and to extend her sentence by denying her "good time" credit.

105. Plaintiff felt like she became a target while at FCI Dublin, and this did

not change when she left. Since leaving BOP custody, Plaintiff has been on supervised release and so still under the supervision of the UNITED STATES–now, in the form of the U.S. Probation Office. The UNITED STATES thus continues to dictate Plaintiff's movements, restrict her liberty, monitor her activities, and subject her to potential sanctions.

106.   While under supervised release, Plaintiff has been in constant fear of being revoked and sent back to BOP custody. This is very common, as studies have shown that approximately 25% of defendants given a term of supervised release will have it revoked within 3 years, whether due to new criminal conduct or simply a technical violation.[3] These revocations result a return to BOP custody for an average of 8–21 months, depending on the severity of the violation.[4] Plaintiff has in fact already experienced this once, resulting in a total of approximately three more months in BOP custody.

107.   Upon her release, Plaintiff was unaware that RAMOS was deceased. He had looked at her file and warned her that he knew where she lived, and she was afraid he might retaliate against her if she spoke up. She was also afraid she would encounter RAMOS and SMITH if she returned to BOP custody. Plaintiff only learned about RAMOS's death and SMITH's arrest in late 2025.

108.   The abuse, threats, and intimidation at FCI Dublin made it impossible for Plaintiff to report her claims or pursue her legal rights while incarcerated. Even after her release, the threats made against Plaintiff and the UNITED STATES' continued control and authority over her continued to render her incapable of seeking relief.

---

[3] James L. Johnson, *Federal Post-Conviction Supervision Outcomes: Rearrests and Revocations*, 87 FED. PROBATION J. (Sept. 2023), at 7, https://www.uscourts.gov/file/78377/download.

[4] U.S. Sent'g Comm'n, *Federal Probation and Supervised Release Violations* (Jul. 2020), at 35, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2020/20200728_Violations.pdf.

109. Additionally, Plaintiff's severe symptoms of anxiety, depression, post-traumatic stress disorder, eating disorder, and substance use disorder interfered with her ability to file her claim within two years of the abuse.

110. Plaintiff submitted her "Claim for Damage, Injury, or Death" to the UNITED STATES on January 4, 2026; the UNITED STATES acknowledged its receipt on January 20, 2026.

111. Plaintiff's FTCA claim should be considered timely filed given that Plaintiff is still on supervised release and thus remains under the control of the UNITED STATES. Supervised release imposes continuing restrictions on Plaintiff's liberties, subjects her to supervision and sanction, and perpetuates the same coercive conditions of control and fear of retaliation that prevented her from asserting her claim earlier.

112. Alternatively, Plaintiff is entitled to equitable tolling for this claim. The United States Supreme Court determined the FTCA's statute of limitations is non-jurisdictional and subject to equitable tolling. *United States v. Wong*, 575 U.S. 402, 420 (2015). Equitable tolling applies when (1) a plaintiff pursued her rights diligently, and (2) extraordinary circumstances prevented timely filing. *Wong v. Beebe*, 732 F.3d 1030, 1052 (9th Cir. 2013).

113. Courts have recognized that survivors of sexual abuse may be entitled to equitable tolling where trauma, fear, and coercion prevented timely filing. *See e.g.*, Order granting in Part and Denying in Part Motion to Dismiss at 1, *Su v. United States*, No. 4:25-cv-00329-YGR (N.D. Cal. Sept. 3, 2025), ECF No. 24.; *Stoll v. Runyon*, 165 F.3d 1238, 1242 (9th Cir. 1999) (equitable tolling appropriate where sexual abuse and resulting post-traumatic stress disorder rendered plaintiff unable to timely pursue claims.).

114. Plaintiff faced extraordinary circumstances which prevented the timely filing of her FTCA claim.

115. Because Plaintiff remains on supervised release, she continues to

experience extraordinary circumstances that prevent her from freely accessing the courts or safely pursuing her claims. As long as, Plaintiff remains under the supervision and control of the UNITED STATES with the threat of a return to BOP custody constantly hanging over her head, the threats and coercion that silenced her persist in impeding her pursuit of justice.

116.   Additionally, the prolonged sexual abuse, repeated threats, retaliation by corrections officers, and lasting psychological effects of the substantial sexual abuse made it impossible for her to assert her rights within the usual statutory deadline.

117.   In February 2022, U.S. Representative Jackie Speier went to FCI Dublin to further investigate the potential abuse occurring by BOP and BOP employees. Representative Speier was prevented from speaking with several inmates who had reported abuse and was instead directed to speak only with staff members.[5] This restriction of access to incarcerated survivors of sexual abuse further demonstrated a deliberate effort by FCI Dublin and the BOP to obstruct independent oversight and investigation. This was a continued pattern of cover-up and suppression of reports of abuse at the facility.

118.   A court-appointed Special Master has confirmed that during the time of Plaintiff's incarceration, "there was no safe or consistent path women could take to file sex abuse complaints," that women were "intimidated and forced to justify why they needed to complete [PREA] forms in the first place," and that women who tried to report abuse were met with retaliation, including solitary confinement and wrongful disciplinary infractions that extended their incarceration.[6]

---

[5] Associated Press, *Whistleblowers Say They're Bullied for Exposing Prison Abuse*, COLUMBIAN (February 24, 2022), https://www.columbian.com/news/2022/feb/24/whistleblowers-say-theyre-bullied-for-exposing-prison-abuse/.

[6] Lisa Fernandez, *FCI Dublin Special Master Finds 'Cascade Failures at Women's Prison*, KTVU (Aug. 20, 2024), https://www.ktvu.com/news/fci-dublin-special-master-finds-cascade-failures-womens-prison; Lisa Fernandez, *Special Master Issues 1st Report on FCI Dublin Sex Assault*, KTVU (Aug. 19, 2024),

119. Judge Yvonne Gonzalez Rogers found "shocking constitutional violations" at FCI Dublin, including systemic failures by the BOP that intentionally disregarded inmates' rights for years despite being fully aware of ongoing abuse or retaliation.[7]

120. These wrongful acts and omissions by The United States and Defendants created an environment in which it was impossible for Plaintiff to assert her rights. The extraordinary circumstances of continuing probation, prolonged sexual abuse, coercion, intimidation, and post-traumatic harm directly prevented Plaintiff from pursuing her claim.

121. Plaintiff acted diligently under these circumstances. Plaintiff exhausted her claims against the United States under the FTCA in early 2025. Plaintiff felt safer to assert her claim after she learned numerous other women who were incarcerated at FCI Dublin had come forward in December 2024. With the knowledge that other women had safely reported the ongoing sexual abuse and retaliation, Plaintiff presented her FTCA claim.

122. Defendants are not entitled to benefit from their own misconduct. Equitable tolling of Plaintiff's statute of limitation prevents this very result. Without the equitable tolling of Plaintiff's statute of limitation Defendants would be rewarded for the very intimidation, retaliation, and constitutional violations that prevented Plaintiff from asserting her claim within the statutory period.

123. The BOP rejected Plaintiff's claim on February 27, 2026.

//

---

https://www.ktvu.com/news/special-master-issues-1st-report-fci-dublin-sex-assault; Lisa Fernandez, *FCI Dublin Special Master Authorized to Ensure Women Care for at Other Prisons: Judge*, KTVU (May 21, 2024), https://www.ktvu.com/news/fci-dublin-special-master-authorized-to-ensure-women-cared-for-at-other-prisons-judge.

[7] Lisa Fernandez, "*Shocking" Constitutional Violation at Now-Closed FCI Dublin: Judge*, KTVU (May 7, 2024), https://www.ktvu.com/news/judge-cites-shocking-constitutional-violations-now-closed-fci-dublin.

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**

***BIVENS* CLAIM — VIOLATION OF THE EIGHTH AMENDMENT**

**CRUEL AND UNUSUAL PUNISHMENT**

**SEXUAL ABUSE, DELIBERATE INDIFFERENCE TO PLAINTIFF'S**

**SAFETY, AND FAILURE TO PROTECT**

**U.S. Const. Amdt. VIII**

**(Against Defendants GARCIA, RAMOS, SMITH, and DOES 1 through 10)**

124. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

125. This constitutional claim is brought pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

126. The Eighth Amendment of the United States Constitution guarantees Plaintiff the right to be free from cruel and unusual punishment. Sexual abuse of a prisoner constitutes cruel and unusual punishment in violation of the Eighth Amendment, as it serves no legitimate penological purpose.

127. Federal law recognizes that an inmate cannot legally consent to sexual contact, harassment, or abuse from a prison guard. This is because the power difference between inmates and guards is so extreme that it negates any ability to consent. Even sexual contact that would be considered consensual in other circumstances is not consensual in the context of an inmate. Plaintiff did not consent to any of the sexual contact between her and R.V.

128. The actions of GARCIA, RAMOS, and SMITH deprived Plaintiff of her Eight Amendment rights.

129. GARCIA failed to supervise and train FCI Dublin COs to prevent sexual abuse, despite being aware of the "rape club" culture at the prison. GARCIA ratified the conduct of RAMOS, SMITH and other COs engaged in sexual abuse of inmates by personally participating in the same conduct. GARCIA also failed to

comply with his duties under the PREA to help detect and prevent sexual abuse. GARCIA's failures also helped to cause RAMOS's and SMITH's deprivation of Plaintiff's rights.

130. Defendants' actions and omissions created a substantial risk of serious harm to female inmates like Plaintiff. Due to their PREA training, Defendants were aware of that substantial risk, and yet they failed to take reasonable measures to abate the risk. In fact, they were deliberately indifferent to that risk by consciously choosing to disregard their duties under federal law.

131. On a regular basis, RAMOS and SMITH violated Plaintiff's constitutional right to be free from cruel and unusual punishment by making nonconsensual, offensive sexual contact with Plaintiff and engaging in sexual conduct for their own sexual gratification and for the purpose of humiliating, degrading, or demeaning Plaintiff. At the time, she was an inmate at FCI Dublin and they were CO with substantial power over her.

132. By intentionally subjecting Plaintiff to sexual acts, RAMOS and SMITH acted maliciously, in a manner that is deeply offensive to human dignity and void of any penological justification.

133. GARCIA. RAMOS. and SMITH acted under color of law, in that they were acting or purporting to act in the performance of their official duties as BOP employees.

134. Plaintiff lacks a statutory cause of action, or an available statutory cause of action does not provide a meaningful remedy; thus, an appropriate remedy, namely damages, can be imposed by this Court.

135. As a direct and legal result of the aforementioned acts and omissions of the Defendants, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

136. Plaintiff also asserts this claim against DOES 1 through 10, inclusive.

137. The conduct of GARCIA, RAMOS, SMITH and DOES 1 through 10, inclusive, was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff. It therefore warrants the imposition of exemplary and punitive damages against them.

## SECOND CAUSE OF ACTION

## GENDER VIOLENCE

## Cal. Civ. Code § 52.4

## (Against Defendants RAMOS, SMITH, and DOES 1–10, inclusive)

138. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

139. At all relevant times mentioned in this Complaint, California Civil Code § 52.4 was in full force and effect and was binding on JONES. Under that statute, any person subjected to gender violence may bring a civil action for damages against the responsible party. Gender violence is a form of sex discrimination that includes a physical intrusion or invasion of a sexual nature under coercive conditions.

140. RAMOS and SMITH committed physical intrusions and/or physical invasions of a sexual nature against Plaintiff under coercive conditions. Specifically, RAMOS groped Plaintiff's breasts and buttocks, digitally penetrated her, and had vaginal sexual intercourse with her.. SMITH exposed himself to Plaintiff and masturbated in front of her.

141. RAMOS and SMITH committed against Plaintiff criminal offenses that have an element of the use, attempted use, or threatened use of physical force against the person of another.

142. RAMOS and SMITH committed these acts against Plaintiff at least in part because of her gender.

143. The acts of RAMOS and SMITH were not discretionary or a policy judgment, as they knew such conduct was prohibited by the PREA, BOP policies,

25
COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

and state and federal law.

144. As a direct and legal result of the aforementioned acts and omissions of RAMOS and SMITH, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

145. Plaintiff also asserts this claim against DOES 1 through 10, inclusive.

146. The conduct of RAMOS, SMITH, and DOES 1 through 10, inclusive, was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff. It therefore warrants the imposition of exemplary and punitive damages against them.

147. Plaintiff further seeks attorneys' fees and costs, as expressly authorized by the statute.

## THIRD CAUSE OF ACTION

### SEXUAL BATTERY

### FTCA; Cal. Civ. Code § 1708.5

### (Against the UNITED STATES, RAMOS, and DOES 1–10, inclusive)

148. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

149. Plaintiff brings this claim for sexual assault under FTCA and California Civil Code § 1708.5 against the UNITED STATES and RAMOS. The UNITED STATES ratified the conduct of RAMOS. Pursuant to 28 U.S.C. § 1346(b), the UNITED STATES is liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would liable to the Plaintiff in accordance with the law of the place where the act or the omission occurred." Thus, under the FTCA, Defendant the UNITED STATES is responsible for the conduct of Defendants RAMOS.

150. On numerous occasions, RAMOS acted with the intent to cause a harmful or offensive contact with Plaintiff's breasts and buttocks and vagina, and a sexually offensive contact resulted.

151. On numerous occasions, RAMOS acted with the intent to cause a harmful or offensive contact by touching Plaintiff with his penis, and a sexually offensive contact with Plaintiff resulted.

152. RAMOS also acted with intent to cause an imminent apprehension of sexual assault and sexually offensive contact with Plaintiff resulted.

153. The offensive contact of RAMOS would offend a reasonable sense of personal dignity and lacked any penological justification.

154. The acts of RAMOS were not discretionary or a policy judgment, as they knew such conduct was prohibited by the PREA, BOP policies, and state and federal law.

155. As a direct and legal result of the aforementioned acts and omissions of RAMOS, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

156. These allegations are also asserted against DOES 1 through10, inclusive.

157. The conduct of RAMOS and DOES 1 through 10, inclusive, was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff. It therefore warrants the imposition of exemplary and punitive damages against them.

158. This action arises out of the commission of a felony. Plaintiff is therefore entitled to reasonable attorneys' fees incurred in prosecuting this action pursuant to Cal. Code of Civil Procedure § 1021.4, according to proof.

//

//

## FOURTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### FTCA; California Common Law

### (Against All Defendants)

159. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

160. Plaintiff brings this claim for intentional infliction of emotional distress under FTCA and California common law against the UNITED STATES, GARCIA, RAMOS, and SMITH. The UNITED STATES ratified the conduct of GARCIA, RAMOS, and SMITH. Pursuant to 28 U.S.C. § 1346(b), the UNITED STATES is liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would liable to the Plaintiff in accordance with the law of the place where the act or the omission occurred." Thus, under the FTCA, Defendant the UNITED STATES is responsible for the conduct of Defendants GARCIA, RAMOS, and SMITH.

161. GARCIA, RAMOS, and SMITH engaged in willful misconduct that was outrageous and offensive.

162. GARCIA, RAMOS, and SMITH intended to cause and/or acted with reckless disregard of causing severe emotional distress to Plaintiff.

163. As a direct and legal result of the aforementioned willful misconduct of GARCIA, RAMOS, and SMITH, Plaintiff was caused to suffer, and did in fact suffer, severe and extreme emotional distress, as well as past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

164. Plaintiff also brings this claim against DOES 1 through 10, inclusive.

165. The conduct of GARCIA, RAMOS, SMITH, and DOES 1 through 10

was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff. It therefore warrants the imposition of exemplary and punitive damages against them.

166. This action arises out of the commission of a felony. Plaintiff is therefore entitled to reasonable attorneys' fees incurred in prosecuting this action pursuant to Cal. Code of Civil Procedure § 1021.4, according to proof.

**FIFTH CAUSE OF ACTION**

**BATTERY**

**FTCA; California Common Law**

**(Against Defendants the UNITED STATES, RAMOS, and DOES 1–10,**

**inclusive)**

167. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

168. Plaintiff brings this claim for sexual assault under FTCA and California Civil Code § 1708.5 against the UNITED STATES and RAMOS. The UNITED STATES ratified the conduct of RAMOS. Pursuant to 28 U.S.C. § 1346(b), the UNITED STATES is liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would liable to the Plaintiff in accordance with the law of the place where the act or the omission occurred." Thus, under the FTCA, Defendant the UNITED STATES is responsible for the conduct of Defendants RAMOS.

169. RAMOS touched Plaintiff and/or caused Plaintiff to be touched with the intent to harm or offend her. Specifically, RAMOS groped her breasts and buttocks and penetrated her vagina with his hands and penis.

170. Plaintiff did not consent to the touching. As an inmate at a correctional facility, she could not legally consent. The touching had no legitimate penological

purpose.

171.   Plaintiff was harmed and offended by the conduct of RAMOS, and a reasonable person in Plaintiff's situation would also have been offended by the touching.

172.   As a direct and legal result of the aforementioned acts and omissions of RAMOS, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

173.   Plaintiff also brings this claim against DOES 1 through 10, inclusive.

174.   The conduct of RAMOS and DOES 1 through 10, inclusive, was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff.  It therefore warrants the imposition of exemplary and punitive damages against them.

175.   This action arises out of the commission of a felony.  Plaintiff is therefore entitled to reasonable attorneys' fees incurred in prosecuting this action pursuant to Cal. Code of Civil Procedure § 1021.4, according to proof.

## SIXTH CAUSE OF ACTION

### NEGLIGENCE

### FTCA; California Common Law

### (Against All Defendants)

176.   Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

177.   Plaintiff brings this claim against the UNITED STATES, GARCIA, RAMOS, and SMITH under the FTCA and California common law based on the actions and/or omissions of these Defendants taken while working at FCI Dublin in their capacities as employees of the BOP and acting within the scope of their employment, with the permission and consent of the UNITED STATES.

178.   Because she was an inmate at a federal prison run by the BOP, Plaintiff

was at all relevant times in the custody and care of the UNITED STATES.

179.   Because of the special relationship between a jailer and prisoner, the UNITED STATES, including its employees GARCIA, RAMOS, and SMITH had a common law duty of care under California law to protect Plaintiff from foreseeable harm, including but not limited to sexual assault, harassment, and abuse.

180.   Sexual assault, harassment, and abuse of female inmate by male COs was a foreseeable harm of which the UNITED STATES was aware.  The BOP was specifically aware of the risk to female inmates based not only on the PREA, but on its knowledge of prior incidents of sexual assault of female inmates in the 1990s and 2000s.  California negligence law does not require the UNITED STATES to have had actual knowledge of the abuse of Plaintiff by RAMOS and SMITH, but nevertheless, the UNITED STATES knew or should have known of what RAMOS and SMITH were doing because of the widespread prison rumors about them and multiple female inmates, as well as their flagrant behavior in making sexual comments to Plaintiff and taking Plaintiff and other prisoners to secluded areas by the kitchen where they should not have been alone with him. The sexual abuse of Plaintiff by RAMOS and SMITH was reasonably foreseeable to the UNITED STATES because the conduct of RAMOS and SMITH made it obvious they were sexually abusing Plaintiff.

181.   The BOP's Personal Conduct rules for staff disallow any sexual activity with an inmate and state that an employee may not allow another person to engage in such behavior. It explicitly states that there is no such thing as consensual sex between staff and inmates.

182.   Further, the UNITED STATES, including its employees GARCIA and RAMOS and SMITH, had additional mandatory statutory duties of care to Plaintiff based on PREA regulations and BOP policy to protect Plaintiff from the known risk of sexual assault, harassment, and abuse.  These duties required it to provide

proper training and supervision of COs and to properly investigate allegations of sexual abuse.

183. The UNITED STATES breached these duties in a variety of ways. It failed to supervised and operated FCI DUBLIN in a manner that would have prevented the ongoing sexual abuse and harassment of Plaintiff by RAMOS and SMITH. The UNITED STATES did not take reasonable, available measures to abate the risk of abuse to Plaintiff and to guarantee her safety, even though a reasonable administrator would have complied with PREA regulations regarding proper prison operations, including adequately monitoring work programming and correctional officer assignments.

184. The BOP as an agency failed to properly monitor, assess, and address its widespread problem with female inmates being sexual assaulted, especially at prisons with recurring issues like FCI Dublin.  It failed to sufficiently train supervisory FCI Dublin employees such as GARCIA, resulting in GARCIA himself engaging in sexual abuse of his wards.  It also lacked an effective system for checking to ensure the validity of PREA audits, instead allowing GARCIA to falsify his report for multiple years, without any knowledge of the BOP.  It further failed to provide sufficient security measures at FCI Dublin, including but not limited to adequate security camera coverage to eliminate unmonitored areas that provided a safe haven for perpetrators.  The BOP also failed to take adequate steps to address complaints of misconduct, resulting in a backlog of thousands of complaints, and it failed to sufficiently analyze those complaints in order to detect patterns of misconduct by prisons or officers.  It failed to properly screen potential employees, failing to research the backgrounds, histories, qualifications, and competence of COs that were hired. And the BOP further failed to properly discipline and terminate COs who engaged in misconduct and retaliation against those who spoke out against misconduct.  Instead, it made reckless and dangerous decisions to transfer those COs to a new unit or even new prison—thus giving them

the opportunity to find a new set of victims.

185.   GARCIA failed in his duties as warden to take reasonable measures to reduce the risk of sexual abuse to Plaintiff and protect her safety.  He failed to comply with his duties under the PREA to conduct an honest and accurate audit of FCI Dublin so that the BOP could take remedial action.  GARCIA further failed to properly train and supervise his COs, and instead participated in and fostered a culture in which the prison was referred to as "the rape club" or the "playground," insinuating that the women were objects for the COs to play with.  His own sexual abuse of inmates ratified the sexual misconduct of his inferiors, as it demonstrated that there would be no consequences for it. He further failed to ensure there was effective supervision to protect the inmates, such as by monitoring work assignments, conducting investigations into suspected sexual abuse, and prohibiting male COs from having such unlimited access to the women without supervision.  GARCIA further failed to ensure that COs like RAMOS and SMITH could not bring contraband onto the property, which they could then use to facilitate sexual abuse.  GARCIA allowed RAMOS and SMITH to be assigned as to supervise female inmates, despite the knowledge that RAMOS and SMITH were suspected to have engaged in sexual abuse of inmates.  GARCIA failed to investigate the misconduct of RAMOS and SMITH or discipline and terminate them based on their actions.

186.   The sexual abuse and harassment of Plaintiff by RAMOS and SMITH occurred as the direct and proximate result of the supervisory negligence of the UNITED STATES and GARCIA.

187.   Plaintiff also brings this claim against DOES 1 through 10, inclusive.

188.   As a direct and legal result of the aforementioned negligence of all Defendants, Plaintiff was caused to suffer, and did in fact suffer, severe and extreme emotional distress, as well as past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

189. The conduct of GARCIA, RAMOS, SMITH, and DOES 1 through 10, inclusive, was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff. It therefore warrants the imposition of exemplary and punitive damages against them.

## SEVENTH CAUSE OF ACTION

### BANE ACT

### FTCA; Cal. Civ. Code § 52.1

### (Against the UNITED STATES, RAMOS, SMITH, and DOES 1–10, inclusive)

190. Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

191. Pursuant to 28 U.S.C. § 1346(b), the UNITED STATES is liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would liable to the Plaintiff in accordance with the law of the place where the act or the omission occurred." Thus, under the FTCA, Defendant the UNITED STATES is responsible for the conduct of Defendant RAMOS and SMITH.

192. Under Cal. Civil Code §52.1, it is a civil rights violation for any person to interfere with the exercise or enjoyment by an individual of her rights secured by the U.S. Constitution or state or federal law. This includes any interference with these rights by threats, intimidation, coercion, or attempted threats, intimidation, or coercion.

193. At all times relevant, Cal. Civil Code §52.1 was in full force and effect and was binding on RAMOS and SMITH.

194. RAMOS and SMITH interfered with Plaintiff's rights to protection from bodily restraint, harm, and insult, as secured by California Civil Code § 43;

her rights under the California and U.S. Constitution to be free of the imposition of punishment without due process, cruel and unusual punishment, and the right to be free from sexual violation; her right under the Eighth Amendment to the United States Constitution to be free of cruel and unusual punishment; and her right to free speech and to report sexual harassment and abuse without retaliation pursuant to California and U.S. statutes and Constitution. They interfered with these rights by threat, intimidation, and/or coercion.

195.   As a direct and legal result of the aforementioned acts and omissions of RAMOS and SMITH, Plaintiff has suffered great physical pain, mental pain and suffering, emotional distress, past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

196.   Plaintiff also brings this claim against DOES 1 through 10, inclusive.

197.   The conduct of RAMOS and SMITH and DOES 1 through 10, inclusive, was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff.  It therefore warrants the imposition of exemplary and punitive damages against them.

198.   Further, Plaintiff is entitled to the statutory civil penalties and attorneys' fees and costs as set forth in § 52.1.

**EIGHTH CAUSE OF ACTION**

**TRAFFICKING VICTIMS PROTECTION ACT**

**18 U.S.C. § 1581, *et seq.***

**(Against the UNITED STATES, RAMOS, and DOES 1–10, inclusive)**

199.   Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

200.   Defendant RAMOS knowingly recruited, enticed, and solicited Plaintiff by offering benefits and things of value, such as not being subjected to discipline, for remaining silent while he engaged in sexual abuse of her.

201.   Defendant RAMOS sexually abused Plaintiff through force and/or

coercion.

202.   Plaintiff also brings this claim against DOES 1–10, inclusive.

203.   As a direct and legal result of the aforementioned conduct of Defendants, Plaintiff was caused to suffer, and did in fact suffer, severe and extreme emotional distress, as well as past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

204.   Further, Plaintiff is entitled to the statutory civil penalties and attorneys' fees and costs as set forth in § 1595.

## NINTH CAUSE OF ACTION

## CALIFORNIA TRAFFICKING VICTIMS PROTECTION ACT

## FTCA; Cal. Civ. Code § 52.5

## (Against the UNITED STATES, RAMOS, and DOES 1–10, inclusive)

205.   Plaintiff incorporates by reference all previous paragraphs as if fully stated herein.

206.   Defendant RAMOS knowingly recruited, enticed, and solicited Plaintiff by offering benefits and things of value, such as not being subjected to discipline, for remaining silent while he engaged in sexual abuse of her.

207.   Defendants RAMOS sexually abused Plaintiff through force and/or coercion.

208.   Plaintiff also brings this claim against DOES 1–10, inclusive.

209.   As a direct and legal result of the aforementioned conduct of Defendants, Plaintiff was caused to suffer, and did in fact suffer, severe and extreme emotional distress, as well as past and future costs of medical care and treatment, and other economic and non-economic damages in an amount not yet ascertained.

210.   Further, Plaintiff is entitled to the statutory civil penalties and attorneys' fees and costs as set forth in § 52.5.

## PRAYER FOR RELIEF

Plaintiff R.V. prays for judgment as follows:

1) For compensatory, general, and special damages, including past, present, and future damages, in an amount in accordance to proof;

2) For punitive damages as permitted by law;

3) For reasonable costs as permitted by law;

4) For attorneys' fees under 18 U.S.C. § 1595; 28 U.S.C. § 2678; Cal. Civ. Code §§ 52.1, 52.4, and 1021.4; and

5) For any other relief that is just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all claims so triable.

Respectfully submitted,

Date: March 20, 2026

/s/ *Alana L. McMains*
**Alana L. McMains**
Attorney for Plaintiff

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL